NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241523-U

NO. 4-24-1523

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 26, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Rock Island County |
| STACEY N. BOGGUESS, | ) | No. 22CM67 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Michelle S. Fitzsimmons, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Presiding Justice Harris and Justice Lannerd concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court reversed and remanded for a new trial. While the evidence was
             sufficient to support defendant's conviction for aggravated assault of a teacher or
             school employee, plain error occurred in the admission of the investigating police
             officer's testimony about witness statements, as well as his opinion about
             defendant's commission of assault.

¶ 2     Defendant, Stacey N. Bogguess, was convicted by a jury of aggravated assault of a

teacher or school employee (720 ILCS 5/12-2(b)(2) (West 2022)). The trial court sentenced

defendant to 30 days of court supervision and entered a financial sentencing order with $75 in

fines, $439 in assessments, and $168.67 in fees. According to the sentencing order, the court

applied defendant's $300 bond toward her fines, fees, and assessments before waiving the

remaining assessments based on indigency. Defendant appeals, arguing that (1) the evidence was

insufficient to prove her guilty beyond a reasonable doubt, (2) the prosecutor elicited inadmissible

evidence from the investigating police officer, (3) the prosecutor committed error in his statements

to the jury, and (4) the court erred in applying her bond toward her assessments. We find that plain error occurred when the investigating police officer testified about statements witnesses made to him and provided his opinion that defendant committed assault. Thus, we reverse and remand for a new trial.

¶ 3                                    I. BACKGROUND

¶ 4        On March 4, 2022, defendant was charged with aggravated assault of a teacher or school employee (720 ILCS 5/12-2(b)(2) (West 2022)). The complaint alleged that on February 16, 2022, defendant, while on the grounds of Longfellow Elementary School and knowing Rocio Guzman to be a school employee, committed an assault when she "approached Rocio Guzman in an aggressive manner while yelling and threatening Rocio Guzman, thereby placing Rocio Guzman in reasonable apprehension of receiving a battery." (Rocio Guzman is now Rocio Ambriz but is known at school as Ms. Rosie, so we will refer to her as Ms. Rosie in this appeal.)

¶ 5        In May 2022, the trial court entered an order appointing the public defender to represent defendant. In January 2023, defendant failed to appear in court. As a result, the court set bail at $3,000 and required payment of a bond of $300. On January 13, 2023, someone paid the $300 bond on defendant's behalf to secure her release.

¶ 6        In January 2024, the case proceeded to a jury trial. Ryan Manecke, a Rock Island police officer, testified that on the morning of February 16, 2022, he was dispatched to Longfellow Elementary School "to remove a subject." Manecke was dispatched as the "primary officer" because the school was within his "beat." When he arrived, two police officers were present outside the school with defendant. After speaking with one of the officers outside, Manecke entered the school to talk to witnesses. When he entered the main office, he encountered Principal

Dave Knuckey, Aaron Buggs, and Ms. Rosie. He interviewed all three of them about the incident. Manecke stated that Ms. Rosie "appeared upset about what had happened."

¶ 7 Thereafter, the following colloquy took place between the prosecutor and Manecke:

"Q. Okay. The information that was received during the course of the investigation, was that consistent amongst all the people that you spoke to?

A. It was, yes.

Q. Did you—was—was it determined that a crime had been committed ***?

A. Yes, there was.

Q. And what was that?

A. It would—it was a determination of an assault that had occurred.

Q. Okay. Again, as part of your investigation, were you able to determine the person responsible for the assault?

A. Yes.

Q. And if you were to see that person again, would you be able to identify them?

A. I would, yes.

Q. If that person's here in the courtroom today, could you please point out where they're sitting and identify an item of clothing they were in.

A. Sitting to my left wearing a white sweater.

[PROSECUTOR]: Your Honor, I'd ask the Court to take note that Officer Manecke did make an in-court identification of the defendant.

THE COURT: That is noted for the record."

¶ 8 Thereafter, the prosecutor asked Manecke about images taken from his body-worn camera showing the vestibule and main office of Longfellow Elementary School. Manecke testified that Knuckey's office was located on the left side of the main office, with windows to the "front main desk area," where Ms. Rosie sat. Manecke testified that when he entered the school, he found Ms. Rosie sitting at the front desk in the school's main office. The desk was surrounded by plexiglass, which was in place when Manecke entered the office.

¶ 9 On cross-examination, Manecke agreed that the right side of Ms. Rosie's desk attached to a wall and that the desk went all the way down to the floor. Manecke agreed that the only way to get to where Ms. Rosie was sitting behind the desk was to travel to the left of the desk and enter through the back. Manecke agreed that he did not witness what occurred and was piecing things together based on "[s]tatements."

¶ 10 On redirect examination, Manecke estimated that the distance from the front of Ms. Rosie's desk to the back entry area of the desk was approximately four feet. Manecke agreed that "there was no battery that was witnessed or occurred." He testified that defendant was charged with "assault." He agreed that a battery could be committed on Ms. Rosie only if someone "work[ed] their way around the desk" and entered through the back.

¶ 11 Knuckey testified that he was the principal of Longfellow Elementary School in 2022. He testified that on February 16, 2022, defendant's daughter, D.R., was late to school. Ms. Rosie buzzed in defendant and D.R. at the school's front entrance. Knuckey said defendant "came in very upset, signed in, but went right after Ms. [Rosie]." According to Knuckey, defendant was "[y]elling" and told Ms. Rosie, "You don't talk to [D.R.] that way." Knuckey testified that he "tried to get [defendant] to settle down, but she wouldn't—she wouldn't give [him] the time of day."

¶ 12    Immediately thereafter, Buggs, the building supervisor, came out of his office and "approached" defendant. Knuckey never saw anything happen with the plexiglass surrounding Ms. Rosie's desk and denied that defendant "hit" or "bang[ed] on the plexiglass." Knuckey said defendant was initially standing in front of Ms. Rosie's desk, but as she yelled, she made her way around the desk "until Mr. Buggs intercepted her." Knuckey did not recall any specific statements defendant made while yelling at Ms. Rosie.

¶ 13    According to Knuckey, defendant had "made her way to the left of" Ms. Rosie's desk when "Mr. Buggs met her" and escorted her out of the office. Buggs was "very calm" and repeatedly told defendant, "[Y]ou can't do that here." Defendant "just kept saying to Ms. [Rosie], 'I'll get you. I'll get you.' "

¶ 14    On cross-examination, Knuckey testified that he was standing to the right of defendant during the entire "confrontation." Ms. Rosie did not raise her voice in response to defendant but called the police. He agreed that "defendant never made it to the back of the desk." Knuckey testified that he did not "feel the need to try to intercept" defendant "[b]ecause [he] knew that Mr. Buggs was on his way." He said that defendant "yelled at Ms. [Rosie] continually" as Buggs escorted her out of the office. He testified that Buggs stopped defendant "[a]bout a foot" from the "entranceway to the back of Ms. Rosie's desk." After defense counsel refreshed Knuckey's recollection, Knuckey agreed that the day before this incident, Ms. Rosie said, in D.R.'s presence, "I don't want [D.R.] around me."

¶ 15    Buggs testified that he was the building supervisor and in charge of security at Longfellow Elementary School in 2022. Buggs testified that on the morning of February 16, 2022, as he sat at his desk near the main office, he "heard an interaction" at Ms. Rosie's desk. He said it first sounded like "a regular conversation" but became "elevated." He said he got up from his desk

when he heard defendant yelling. Buggs said that as the conversation escalated, defendant began walking "along the side" of Ms. Rosie's desk and "knocked over" two pieces of plexiglass surrounding Ms. Rosie's desk. Buggs said he approached defendant, met her "chest to chest" and "stopped her." He then escorted defendant out of the school building, telling her that she had to "get out of here." Buggs testified that defendant made it about halfway around Ms. Rosie's desk before he stopped her. Buggs said defendant was making comments to Ms. Rosie the entire time.

¶ 16    On cross-examination, Buggs agreed that he did not mention anything about the plexiglass in his statement to police on the day of the incident. He agreed that was relevant information and that his memory of the incident was better on February 16, 2022, than at the time of the trial. Buggs said he talked to defendant outside after the incident and described her as "calm" and "rational."

¶ 17    Ms. Rosie testified that she had been employed as the secretary at Longfellow Elementary School for five years. She testified that her desk was in the shape of an oval, with an opening behind it where she could enter. She testified that from the front of her desk, where she sat, to the back opening of her desk was approximately "two arm lengths."

¶ 18    Ms. Rosie testified that at approximately 9 a.m. on February 16, 2022, she saw defendant and D.R. approaching the outside door to the school building. Ms. Rosie told Knuckey, and he instructed her to buzz defendant in, which she did. Defendant then proceeded to Ms. Rosie's desk, where the sign-in binder was located, and signed in D.R. because she was late. Ms. Rosie testified that Knuckey was standing on the left side of her desk at that time but then went into his office. According to Ms. Rosie, defendant said, "[T]his is ridiculous," and she "became irate." Defendant told Ms. Rosie, "Don't f*** talk to my daughter anymore. You don't have a right to talk to my daughter. Stay away from her." Ms. Rosie said she tried to address defendant, but the

situation "escalated," with defendant increasing "the amount of profanity" and becoming "even more explosive."

¶ 19    Ms. Rosie testified that she told defendant she needed to leave. After that, Ms. Rosie said defendant pushed the plexiglass surrounding her desk and caused a piece of it to fall on her desk. Ms. Rosie said that the piece "struck [her] hand." Ms. Rosie then told defendant she was calling the police and again told defendant that she needed to leave. According to Ms. Rosie, defendant responded, "No. No. I don't have to go anywhere." Defendant also said, "Come at me, Rosie." After that, "Buggs pushed [defendant] out like a train."

¶ 20    When defendant was moving around the desk, Ms. Rosie believed that, "without a doubt, [defendant] was going to come at [her]." According to Ms. Rosie, defendant kept saying, "Come at me. Come at me." Ms. Rosie testified that she felt like defendant was "threatening [her]." Ms. Rosie testified that after that, Buggs and Knuckey "pushed [defendant] outside." Ms. Rosie agreed that "both Mr. Knuckey and Mr. Buggs were there the entire time." Ms. Rosie identified defendant as the "person who threatened [her]."

¶ 21    On cross-examination, Ms. Rosie agreed that she talked to a police officer immediately after the incident and admitted that she did not tell him that defendant knocked down any plexiglass panels. She said she was putting the plexiglass panel back up when an officer was entering the office. On re-direct, Ms. Rosie said she was "shaken" and "distraught" following the incident and did not believe the plexiglass was important. Ms. Rosie said she "feared for [her] life" and was concerned that defendant "was going to cause more harm" to her.

¶ 22    After the State rested its case, defense counsel moved for a directed verdict, arguing that no "reasonable jury could find the defendant guilty of aggravated assault, assault being the reasonable apprehension of a battery." The trial court denied the motion, finding that "in looking

at the evidence in the light most favorable to the nonmoving party for this motion for a directed verdict, I do find that there's enough there to survive a motion for directed verdict."

¶ 23        Defendant's first witness was Officer Manecke, who testified that when he entered the school's main office on February 16, 2022, he did not observe "any plexiglass panels out of order." Manecke agreed that if any witnesses had told him that plexiglass had been pushed over, he would have included that in his report because "that would be important." He agreed that was "not in [his] report." He further agreed that he "saw no evidence of a battery."

¶ 24        On cross-examination, Manecke testified that defendant was charged with assault, not battery. The prosecutor questioned Manecke about his interviews with Knuckey and Buggs and queried: "[D]id you ask them specifically what they saw?" Manecke responded:

>            "When I spoke with both of them, I just asked them what had occurred or what they witnessed had occurred before we arrived. And that's when they told me about what had happened between the victim and [defendant] and then that they had to prevent [defendant] from going around the side of the desk to get to the victim."

Manecke testified that he considered that to be the most pertinent information "from what we received at the time."

¶ 25        D.R., who was 14 years old at the time of the trial, testified that the day before the incident between defendant and Ms. Rosie, Ms. Rosie said "something about [D.R.] being late and also like—made it seem like she didn't want [D.R.] around her." The next day, D.R. entered the office with defendant, and defendant asked to talk to Ms. Rosie about what she said the day before. According to D.R., Ms. Rosie told defendant "to get out and to leave." D.R. said Ms. Rosie and defendant "started arguing and then [Ms. Rosie] slammed her hands on the desk and stood up."

After that, Ms. Rosie and defendant "started yelling and arguing louder." Ms. Rosie then said something about D.R., and defendant told D.R. "to go to class." After D.R. left, she could still hear defendant and Ms. Rosie arguing.

¶ 26        D.R. testified that when she and defendant came into the office, defendant walked up to the sign-in sheet in front of Ms. Rosie's desk. When D.R. left the office, defendant was still standing at the front of Ms. Rosie's desk but slightly to the left of the sign-in sheet. D.R. testified she was standing to the right of defendant until defendant instructed her to leave. D.R. denied seeing anyone hit the plexiglass or hearing "anybody making any threats to anybody." D.R. also denied that Knuckey was in the office when she and defendant entered but said she "saw him coming in" when she "was leaving." She said she thought she heard Buggs when she was leaving but said she "didn't see him."

¶ 27        Defendant testified that she drove D.R. to school on February 16, 2022, and entered the school with D.R. so she could speak with Ms. Rosie. Defendant said Ms. Rosie was sitting behind her desk and no other adults were in the main office. Defendant testified that she said, "[E]xcuse me, Ms. Rosie, I would like to speak with you about the incident that happened yesterday." According to defendant, Ms. Rosie "rudely slapped her hand down on the desk and said I am not discussing anything with you, get out of my office." Defendant replied, "I would like to talk about this. My child feels intimidated." At that point, neither Knuckey nor Buggs was present. After defendant and Ms. Rosie "exchanged some more words," defendant said she asked to speak to Knuckey. When defendant continued to ask to speak to Knuckey, Ms. Rosie picked up the phone, called the police, "and said she wanted [defendant] escorted out of the building." Defendant testified that Ms. Rosie then "made an inappropriate comment about [D.R.]" and they both got louder. It was then that defendant first saw Buggs coming toward her.

¶ 28    Defendant testified that Buggs said, "[H]ey, this is a school, can't have you guys doing that," which drew defendant's attention away from Ms. Rosie. Buggs then directed defendant out of the office by backing her toward the door. Defendant said she "turned around and left" because she "didn't want to continue to have a scene" and embarrass D.R. Defendant stated that Buggs "didn't have to use like physical force or anything like that like I was being irate. He just was kind of respectfully ushering me out to defuse the situation."

¶ 29    Defendant said the situation "escalated very fast and it deescalated just as quick." She estimated that Knuckey came out of his office approximately 35 to 45 seconds after Buggs did. Defendant denied ever threatening Ms. Rosie or making "any scary gestures towards her." Defendant said, "I was trying to be as peaceful as I could as there *** were children and Mr. Buggs was right, it wasn't appropriate." Defendant denied touching or pushing the plexiglass surrounding Ms. Rosie's desk and said, "I wasn't angry at that type of level." Defendant also denied that any plexiglass fell down. Defendant testified that when Buggs confronted her, she was only slightly to the left of Ms. Rosie's desk and nowhere near halfway around the desk. She denied attempting "a battery" or making "efforts to try to make a battery happen."

¶ 30    The jury found defendant guilty. Defendant filed a post-trial motion, arguing, in part, that the State failed to prove her guilty beyond a reasonable doubt. The trial court denied the motion.

¶ 31    On April 15, 2024, defense counsel filed a certificate of waiver of assessments pursuant to Illinois Supreme Court Rule 404 (eff. Sept. 1, 2023). On the same day, the trial court sentenced defendant to 30 days of court supervision and stated, "I would assess the minimum fines, but *** those fines will be waived." The court then entered a "Financial Sentencing Order" that imposed a fine of $75, a criminal assessment of $439, and fees totaling $168.67 against defendant.

According to the sentencing order, the court applied defendant's $300 bond toward those fines, fees, and assessments and waived the remaining balance.

¶ 32       This appeal followed.

¶ 33                          II. ANALYSIS

¶ 34       On appeal, defendant argues that (1) the evidence was insufficient to prove her guilty beyond a reasonable doubt, (2) the prosecutor elicited inadmissible evidence from the investigating police officer, (3) the prosecutor committed error in his statements to the jury, and (4) the trial court erred in applying her bond toward her assessments.

¶ 35                    A. Sufficiency of the Evidence

¶ 36       Defendant first argues that the State failed to prove beyond a reasonable doubt that she was guilty of assaulting Ms. Rosie. Specifically, she contends that the evidence was insufficient to establish that her conduct placed Ms. Rosie in reasonable apprehension of receiving a battery.

¶ 37       When a defendant challenges the sufficiency of the evidence supporting her conviction, we review whether, viewing the evidence in the light most favorable to the State, a rational trier of fact could find the elements of the crime beyond a reasonable doubt. *People v. Cline*, 2022 IL 126383, ¶ 25. We draw all reasonable inferences in the State's favor. *Cline*, 2022 IL 126383, ¶ 25. We do not retry the defendant and will not substitute our judgment for that of the trier of fact. *People v. McLaurin*, 2020 IL 124563, ¶ 22. It is the responsibility of the jury, as the trier of fact, to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from the facts. *McLaurin*, 2020 IL 124563, ¶ 22. We will reverse a conviction only if the evidence is so unreasonable, improbable, or unsatisfactory as to raise a reasonable doubt of the defendant's guilt. *Cline*, 2022 IL 126383, ¶ 25.

¶ 38    "A person commits an assault when, without lawful authority, he or she knowingly engages in conduct which places another in reasonable apprehension of receiving a battery." 720 ILCS 5/12-1(a) (West 2022). In turn, a battery occurs when a person "knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a) (West 2022). "A person commits aggravated assault when, in committing an assault, he or she knows the individual assaulted to be *** [a] teacher or school employee upon school grounds or grounds adjacent to a school or in any part of a building used for school purposes." 720 ILCS 5/12-2(b)(2) (West 2022).

¶ 39    Defendant does not dispute that she knew Ms. Rosie was a school employee or that the incident occurred on school grounds. Rather, she argues that the evidence failed to establish beyond a reasonable doubt that she placed Ms. Rosie in reasonable apprehension of receiving a battery.

¶ 40    "Whether the victim was placed in reasonable apprehension of receiving a battery is a question that the fact finder must resolve." *In re Gino W.*, 354 Ill. App. 3d 775, 777-78 (2005). The existence of reasonable apprehension may be inferred from the evidence, including the conduct of the victim and the defendant. *Gino W.*, 354 Ill. App. 3d at 778. "Although we examine the emotional effect upon the putative victim, that response must be reasonable." *People v. Floyd*, 278 Ill. App. 3d 568, 570 (1996). It is not enough that the victim feels that the defendant is going to harm her. *Floyd*, 278 Ill. App. 3d at 570. "[R]easonable apprehension is an objective standard, meaning that the apprehension must be one which would normally be aroused in the mind of a reasonable person." (Internal quotation marks omitted.) *Gino W.*, 354 Ill. App. 3d at 779. Additionally, "a victim's apprehension must be of an immediate or imminent battery, not of an

indeterminate future harm." *People v. Vanhoose*, 2020 IL App (5th) 170247, ¶ 26 (citing *People v. Kettler*, 121 Ill. App. 3d 1, 6 (1984)).

¶ 41    "[W]ords alone are not usually enough to constitute an assault." *Floyd*, 278 Ill. App. 3d at 570. "Some action or condition must accompany those words before there is a violation of the statute." *Floyd*, 278 Ill. App. 3d at 571. Physical movement or gestures of a threatening nature "are required before threatening words may be considered to be an assault." See *Vanhoose*, 2020 IL App (5th) 170247, ¶¶ 27, 37; see also *People v. Childs*, 305 Ill. App. 3d 128, 140 (1999) (finding "defendant's threatening gestures toward his attorney, necessitating the intervention of a guard, *** constitute[d] aggravated assault"); *People v. Peterson*, 41 Ill. App. 3d 1067, 1069 (1976) (finding that a defendant who swung at a victim and challenged him by saying, "Come on, just you and me," engaged in "menacing conduct" sufficient to establish that the victim "was placed in reasonable apprehension of receiving a battery"); *People v. Ferguson*, 181 Ill. App. 3d 950, 954 (1989) (nothing that evidence of a defendant's verbal threat to the victim at close range, hostility and anger evident in the defendant's remarks to the victim, and the temperament the defendant displayed toward the victim can support a conclusion that the victim was placed in reasonable apprehension of receiving a battery by the defendant and that the defendant therefore committed assault).

¶ 42    Viewing the evidence in the light most favorable to the State, the record here shows that defendant (1) yelled expletives at Ms. Rosie, (2) walked along the side of Ms. Rosie's desk and was heading toward the back, where there was an opening, (3) hit and knocked down plexiglass attached to Ms. Rosie's desk, which struck Ms. Rosie's hand, (4) challenged Ms. Rosie to "[c]ome at [her]," (5) expressed that she was "going to get [her]," and (6) retreated only when physically confronted by Buggs. Additionally, Ms. Rosie testified that she felt threatened by

- 13 -

defendant and believed defendant was going to cause her harm, which is why she called the police. Based on this evidence, the jury could reasonably find the combination of defendant's words and actions placed Ms. Rosie in reasonable apprehension of receiving a battery from defendant and that defendant was therefore proven guilty of aggravated assault beyond a reasonable doubt. See *Ferguson*, 181 Ill. App. 3d at 954; *Peterson*, 41 Ill. App. 3d at 1069.

¶ 43        Defendant, however, argues that the evidence was insufficient to find her guilty of aggravated assault because there was conflicting testimony about whether any plexiglass panels fell down and that, even if they did, "they did not cause any harm." In arguing that the testimony of Buggs and Ms. Rosie about the plexiglass falling down was not credible, defendant asks us to reweigh the evidence and assess the credibility of the witnesses, which we may not do. See *McLaurin*, 2020 IL 124563, ¶ 22. It was for the jury to resolve the inconsistencies in the testimony of the witnesses. See *McLaurin*, 2020 IL 124563, ¶ 22.

¶ 44        Furthermore, we reject defendant's contention that because the panel that struck Ms. Rosie did not "harm" her, an assault did not occur. As defendant pointed out at trial, she was not charged with battery. Therefore, the State did not have to prove that defendant "cause[d] bodily harm" or made "physical contact of an insulting or provoking nature." 720 ILCS 5/12-3(a) (West 2022). Instead, the State had to prove that defendant, "without lawful authority, knowingly engage[d] in conduct which place[d] another in *reasonable apprehension of receiving a battery*." (Emphasis added.) 720 ILCS 5/12-1(a) (West 2022). Viewing the evidence in the light most favorable to the State, we find it was reasonable for the jury to conclude that defendant's conduct, which included walking around Ms. Rosie's desk toward the back, where she could enter, while yelling threats and expletives at Ms. Rosie and banging on plexiglass panels hard enough to make one or more of them fall onto Ms. Rosie's desk—placed Ms. Rosie in reasonable apprehension of

receiving a battery. Thus, we find no reason to reverse defendant's conviction on this basis. See *Cline*, 2022 IL 126383, ¶ 25.

¶ 45                                      B. Officer's Manecke's Testimony

¶ 46          Defendant next argues that plain error occurred when the prosecutor elicited testimony from Officer Manecke that (1) Knuckey, Buggs, and Ms. Rosie provided him with consistent accounts of the incident, (2) Buggs and Knuckey told him "that they had to prevent [defendant] from going around the side of the desk to get to the victim," and (3) defendant committed assault. Defendant admits that she did not raise these errors below but asks this court to review them for plain error or, alternatively, ineffective assistance of counsel for failing to preserve them.

¶ 47          To preserve an issue for review, a defendant must both object at trial and raise the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Failure to do both results in forfeiture of the claim on appeal. *Enoch*, 122 Ill. 2d at 186. Under the plain error doctrine, a reviewing court may address a forfeited claim in two circumstances:

> "(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Belknap*, 2014 IL 117094, ¶ 48.

"In applying the plain error doctrine, it is appropriate to determine first whether error occurred at all [citation] because 'without error, there can be no plain error.' " *People v. Hood*, 2016 IL 118581, ¶ 18 (quoting *People v. Smith*, 372 Ill. App. 3d 179, 181 (2007)).

¶ 48    A police officer may testify about the course of an investigation, including "events leading up to the defendant's arrest, where such testimony is necessary and important to fully explain the State's case to the trier of fact." *People v. Simms*, 143 Ill. 2d 154, 174 (1991). This testimony may include "statements made by others, such as victims or witnesses," but only "when such testimony is offered not for the truth of the matter asserted, but instead to show 'the investigative steps taken by the officer leading to the defendant's arrest.' " *People v. Risper*, 2015 IL App (1st) 130993, ¶ 39 (quoting *People v. Pulliam*, 176 Ill. 2d 261, 274 (1997)). Critically, an officer's testimony "cannot reveal the *substance* of the statements made by the nontestifying witnesses to the officer in the course of the investigation." (Emphasis in original.) *Risper*, 2015 IL App (1st) 130993, ¶ 41; see *People v. Boling*, 2014 IL App (4th) 120634, ¶ 107. Thus, "an officer may not testify to the content of any statement he or she received." *Risper*, 2015 IL App (1st) 130993, ¶ 41; see *People v. Trotter*, 254 Ill. App. 3d 514, 527 (1993).

¶ 49                    1. *Consistency of the Witnesses' Statements*

¶ 50    While an officer may not testify about the substance of his conversations with a witness, an officer is not prohibited from testifying to the fact that he spoke to a witness. See *Trotter*, 254 Ill. App. 3d at 527. Additionally, "[u]nder Illinois law a witness is not permitted to comment on the veracity of another witness'[s] credibility." *People v. Munoz*, 398 Ill. App. 3d 455, 487 (2010).

¶ 51    Here, in answering the prosecutor's question about whether Ms. Rosie, Knuckey, and Buggs provided statements consistent with each other, Manecke did not reveal the substance of the witnesses' statements but merely testified that their statements were consistent with each other. Additionally, Manecke never commented on the credibility of the witnesses' statements. Accordingly, it was proper for the prosecutor to elicit this testimony from Manecke.

¶ 52                    2. *Substance of the Witnesses' Statements*

¶ 53          Defendant next contends that the prosecutor erred in eliciting from Manecke the substance of Buggs's and Knuckey's statements to him, specifically, that they told Manecke "that they had to prevent [defendant] from going around the side of the desk to get to the victim."

¶ 54          As discussed above, "there is a distinction between an officer testifying to the fact that he spoke to a witness without disclosing the contents of that conversation and an officer testifying to the contents of the conversation." *Trotter*, 254 Ill. App. 3d at 527. "Under the investigatory procedure exception, the officer's testimony must be limited to show how the investigation was conducted, not to place into evidence the substance of any out-of-court statement or conversations for the purpose of establishing the truth of their contents." *Trotter*, 254 Ill. App. 3d at 527. Additionally, when such testimony is elicited, "the trial court must instruct the jury that the testimony was introduced for the limited purpose of explaining what caused the police to act, and that they were not to accept the statement as true." *Trotter*, 254 Ill. App. 3d at 527; see *Simms*, 143 Ill. 2d at 174 (finding no error in the admission of police officer's testimony where the trial court specifically instructed the jury that the officer's testimony was introduced for the limited purpose of explaining what caused the police to act and that they were not to accept the truth of the witness's statement to the officer); *Risper*, 2015 IL App (1st) 130993, ¶ 44 (finding harmless error in the admission of the officer's testimony because the trial court immediately admonished the jury that it could only consider the testimony for the purpose of understanding why the officer interviewed the defendant, not for the truth of the statements made by the witnesses to the officer).

¶ 55          If the jury is not instructed to limit its consideration of the evidence accordingly, jurors have no reason not to consider the testimony as evidence of the defendant's guilt. *Boling*, 2014 IL App (4th) 120634, ¶ 135; see *Trotter*, 254 Ill. App. 3d at 527-28 (stating that where no

limiting instruction is given, "it cannot be presumed that the jury's use of the evidence was limited to non-hearsay purposes"). As a result, allowing an officer to testify about a witness's out-of-court statements without giving the jury a limiting instruction amounts to prejudicial and reversible error. *Trotter*, 254 Ill. App. 3d at 528; see *Boling*, 2014 IL App (4th) 120634, ¶ 135.

¶ 56    The admission of a witness's improper testimony about the contents of a nontestifying witness's out-of-court statements amounts to clear and obvious error even if the defendant does not object. See *Boling*, 2014 IL App (4th) 120634, ¶¶ 115-16; *People v. Armstead*, 322 Ill. App. 3d 11-13 (2001). When a defendant fails to object to the improper introduction of out-of-court statements for the purported purpose of explaining the steps of an investigation, the trial court should "*sua sponte* exercise[ ] its discretion to determine the appropriate extent to which the State may use such potentially prejudicial evidence in its case in chief." *Boling*, 2014 IL App (4th) 120634, ¶ 115.

¶ 57    Here, following defense counsel's direct examination of Manecke in defendant's case-in-chief, on cross-examination, the prosecutor questioned Manecke about whether he asked Knuckey and Buggs "specifically what they saw." Manecke responded as follows:

> "When I spoke with both of them, I just asked them what had occurred or what they witnessed had occurred before we arrived. And that's when they told me about what had happened between [Ms. Rosie] and [defendant] and then that they had to prevent [defendant] from going around the side of the desk to get to the victim."

The first part of Manecke's response was proper because it did not disclose the substance of Buggs's and Knuckey's statements to him. However, it was improper for Manecke to testify that Buggs and Knuckey told him "that they had to prevent [defendant] from going around the side of

- 18 -

the desk to get the victim" because this revealed the substance of Buggs's and Knuckey's statements to him. See *Risper*, 2015 IL App (1st) 130993, ¶ 41; *Boling*, 2014 IL App (4th) 120634, ¶ 107; *Trotter*, 254 Ill. App. 3d at 527.

¶ 58 The State asserts that Manecke's testimony was not offered for the truth of the matter asserted but to describe Manecke's investigatory process. However, the record belies this claim. To "fully explain" its case to the trier of fact (*Simms*, 143 Ill. 2d at 174), Manecke only needed to provide the testimony contained in the first part of his response: that he spoke with Knuckey and Buggs, asked them what occurred and what they witnessed, and that they told him what happened between Ms. Rosie and defendant. Manecke's testimony about Knuckey's and Buggs's statements that "they had to prevent [defendant] from going around the side of the desk to get to the victim" was wholly unnecessary. Additionally, if the State intended for Manecke's testimony to be admitted for the limited purpose of explaining Manecke's investigatory process, it should have tendered a limiting instruction to the trial court explicitly explaining to the jury that " 'the statement is introduced for a limited purpose and that the jury is not to accept the statement for the truth of its contents.' " *Boling*, 2014 IL App (4th) 120634, ¶ 135 (quoting *Armstead*, 322 Ill. App. 3d at 12).

¶ 59 Here, no limiting instruction was given; therefore, even in the absence of an objection, the admission of Manecke's testimony constituted clear and obvious error. See *Boling*, 2014 IL App (4th) 120634, ¶ 115-16; *Armstead*, 322 Ill. App. 3d at 11-13. Because the jury was not instructed to limit its consideration of Manecke's testimony, there was no reason for jurors not to consider the testimony for the truth of the matter asserted and, consequently, as evidence of defendant's guilt. See *Boling*, 2014 IL App (4th) 120634, ¶ 135; *Trotter*, 254 Ill. App. 3d at 527-28.

¶ 60                              3. *Defendant's Commission of Assault*

¶ 61          Defendant also argues that the prosecutor erred in eliciting testimony from Manecke that, based on his investigation, it was determined that defendant had committed assault.

¶ 62          A witness who is not qualified as an expert is a "lay witness." See *People v. Crump*, 319 Ill. App. 3d 538, 542 (2001). A lay witness can provide opinions or inferences only if they are "rationally based on the perception of the witness." Ill. R. Evid. 701 (eff. Jan. 1, 2011). Lay witnesses "may not express an opinion or draw inferences from the facts" but must confine their testimony "to statements of fact of which the witness has personal knowledge." *Crump*, 319 Ill. App. 3d at 542. "Lay witness testimony is especially improper and prejudicial when it goes to the ultimate question of fact that is to be decided by the jury." *Crump*, 319 Ill. App. 3d at 542 (citing *People v. McClellan*, 216 Ill. App. 3d 1007 (1991)). It is the function of the jury to decide the defendant's guilt or innocence. *People v. Jones*, 364 Ill. App. 3d 740, 752 (2006).

¶ 63          A prosecutor should not attempt to elicit improper opinion testimony from any witness, especially a police officer. See *Crump*, 319 Ill. App. 3d at 542; *Munoz*, 398 Ill. App. 3d 455, 489 (2010). "A police officer is a figure of authority whose testimony may be prejudicial if the officer informs the jurors that they should believe a portion of the prosecution's case." *Crump*, 319 Ill. App. 3d at 542 (citing *People v. Sepka*, 51 Ill. App. 3d 244 (1977)); see *Munoz*, 398 Ill. App. 3d at 489 (stating that a police officer is "a 'figure of authority,' whose testimony the jury likely would have credited with more weight"). Thus, courts have found it improper for a prosecutor to ask a police officer if he (1) believed the defendant told him the truth (*People v. Collins*, 2025 IL App (4th) 240364-U, ¶¶ 39, 75-76; *Munoz*, 398 Ill. App. 3d at 488-89), (2) " 'ha[d] reason to believe that the defendant *** committed this offense' " (*Crump*, 319 Ill. App. 3d at 540, 541-543), or (3) had " form[ed] an opinion that a crime had been committed,' "

and if so, " 'in [his] opinion, what crime had occurred?' " (*People v. Suggs*, 2021 IL App (2d) 190420, ¶¶ 17-18).

¶ 64        "While it is improper for an officer to express an opinion as to a defendant's present credibility or guilt, 'statements of past opinions, rather than present ones, do not constitute improper lay opinion testimony.' " *Collins*, 2025 IL App (4th) 240364-U, ¶ 74 (quoting *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 58). Thus, "present opinion testimony is improper; previous opinion testimony is permissible." *People v. Degorski*, 2013 IL App (1st) 100580, ¶ 84. However, if the testimony refers to the past but the jury would have understood it to be the present opinion of the officer, it is improper. See *Suggs*, 2021 IL App (2d) 190420, ¶ 18.

¶ 65        In *Suggs*, 2021 IL App (2d) 190420, ¶¶ 17-18, our appellate court found that the following colloquy between the prosecutor and investigating police officer constituted clear and obvious error:

> " 'Q. Now, after speaking with [Vargas] *** did you form an opinion that a crime had been committed?
>
> A. Yes.
>
> Q. And in your opinion, what crime had occurred?
>
> A. Domestic battery.' "

The appellate court stated that whether the officer's statements were admissible hinged on whether the testimony should be viewed "as a statement of his prior opinion or of an opinion held at the time of trial." *Suggs*, 2021 IL App (2d) 190420, ¶ 17. The court concluded "that the latter view is correct." *Suggs*, 2021 IL App (2d) 190420, ¶ 17. In reaching that conclusion, the court stated:

> "The first question was framed in the past tense, but it pertained only to when Officer Miracle *formed* his opinion. That Officer Miracle formed the opinion

in the past obviously does not mean that he no longer held that opinion. The second question to Officer Miracle was prefaced 'And in your opinion.' We believe that the jury almost certainly would have understood that language as a reference to an opinion Officer Miracle held when he testified. Officer Miracle's opinion testimony was therefore improper." (Emphasis in original.) *Suggs*, 2021 IL App (2d) 190420, ¶ 18.

¶ 66     Similarly, in *Crump*, 319 Ill. App. 3d at 540-41, the appellate court considered whether the trial court abused its discretion in overruling defense counsel's objection to the following exchange between the prosecutor and an officer:

" 'Q. Through the course of your investigation, Officer, did you have reason to believe that the defendant in this case committed this offense?

A. Yes, I did.' "

The court ruled that the prosecutor's question was improper because it "did not concern facts about which the officer had personal knowledge." *Crump*, 319 Ill. App. 3d at 543. Additionally, the court found it "immaterial" whether the prosecutor was asking the officer about his "current" or "past" belief because the prosecutor's question called for the officer to state "his belief about the ultimate disputed fact in the case, *i.e.*, whether the defendant committed the offense." *Crump*, 319 Ill. App. 3d at 543. The court concluded:

"Under *McClellan*, whether the defendant committed the offense was the ultimate question of fact to be decided by the jury. According to *Sepka*, the officer's statement was especially prejudicial because, as an authority figure, he was informing the jury that it should believe a portion of the prosecution's case. We hold, therefore, that the trial judge abused his discretion by admitting in evidence

the officer's statement that he believed the defendant committed the offense."
*Crump*, 319 Ill. App. 3d at 544.

¶ 67 In this case, the colloquy between the prosecutor and Manecke was nearly identical to that in *Suggs*:

"Q. Did you—was—was it determined that a crime had been committed ***?

A. Yes, there was.

Q. And what was that?

A. It would—it was a determination of an assault that had occurred."

However, the questioning did not end there. It continued with the prosecutor asking Manecke: "Again, as part of your investigation, were you able to determine the person responsible for the assault?" Manecke responded, "Yes," and identified defendant in court. This further questioning was very similar to the question found to be improper in *Crump*, where the prosecutor asked the officer if he had " 'reason to believe that the defendant *** committed this offense?' " *Crump*, 319 Ill. App. 3d at 540.

¶ 68 Just as the appellate court in *Suggs* and *Crump* found the testimony in those cases to be improper, we find Manecke's testimony in this case constituted clear and obvious error for several reasons. First, Manecke's testimony constituted improper opinion testimony from a lay witness about matters of which Manecke did not have personal knowledge. See *Crump*, 319 Ill. App. 3d at 543. Additionally, while the prosecutor's initial question about whether a crime "had been committed" was phrased in the past, the jury almost certainly would have understood Manecke's response to refer to an opinion he still held when he testified. See *Suggs*, 2021 IL App (2d) 190420, ¶ 18. Moreover, Manecke's affirmative response of "[y]es" to the prosecutor's

question about if he "was able to determine the person responsible for the assault" was not phrased in the past and, therefore, would certainly have been interpreted by the jury as his opinion at the time of trial. Most importantly, Manecke's testimony related to the ultimate disputed fact in the case, *i.e.*, whether defendant committed assault, which was for the jury to decide. See *Crump*, 319 Ill. App. 3d at 543-44; *Jones*, 364 Ill. App. 3d at 752. Manecke's testimony was especially prejudicial because Manecke was an authority figure informing the jury that it should believe the State's case. See *Munoz*, 398 Ill. App. 3d at 489; *Crump*, 319 Ill. App. 3d at 544.

¶ 69       The State contends that Manecke's testimony was proper opinion testimony because Manecke was "merely explaining the 'steps taken in an investigation of the crime.' " In *Crump*, the State made a similar argument, asserting that the officer's testimony was necessary "to show why the policeman did what he did next." *Crump*, 319 Ill. App. 3d at 543-544. The appellate court rejected the State's argument, finding there was no "exception permitting lay opinion testimony to be admitted in evidence to show why a police officer did what he or she did next." *Crump*, 319 Ill. App. 3d at 543. Further, the court found that "it was not necessary for the prosecutor to elicit testimony from [the officer] that the officer believed the defendant committed the offense" to establish what the officer did next, which was to "put out a probable cause radio call." *Crump*, 319 Ill. App. 3d at 544. Instead of expressing his opinion, the officer should have testified about "matters within the scope of the officer's personal knowledge such as whether the defendant was in the area, and if not, who arrested the defendant, and how the arrest came about." *Crump*, 319 Ill. App. 3d at 544. Because "[t]he officer then could have stated that he put out a probable cause call on the radio without the necessity of expressing his belief that the defendant committed the offense," the officer's statement was improper. *Crump*, 319 Ill. App. 3d at 544.

¶ 70    Here, Manecke's testimony was not provided to describe the sequential account of his investigatory process. Critically, after testifying that a determination was made that an assault had been committed by defendant, Manecke did not state what he did as a result of that determination, such as arrest defendant. Instead, immediately after providing his opinion about defendant's guilt, Manecke began testifying about the scene and describing it to the jury. Additionally, even if Manecke's testimony was offered to explain his next steps in the investigatory process, his opinions about what offense was committed and who committed it were not necessary to show what he did next. See *Crump*, 319 Ill. App. 3d at 544. Manecke's testimony served "no apparent purpose other than to invade the province of the jury and tell them who to believe." See *Munoz*, 398 Ill. App. 3d at 488. Because the admission of Manecke's testimony served no other purpose than to impermissibly comment on the ultimate issue of defendant's guilt, it constituted clear and obvious error. See *Munoz*, 398 Ill. App. 3d at 488-89 (finding plain error based on the officer's comments); *Suggs*, 2021 IL App (2d) 190420, ¶¶ 10-11, 17-20 (applying plain-error review and finding that the officer's comments justified reversal of the defendant's conviction and remand for a new trial).

¶ 71                              4. *Plain Error*

¶ 72    Having found that Manecke's testimony constituted clear and obvious error, we must now determine if this amounted to plain error. Defendant contends that this improper testimony amounted to plain error under the first prong because the evidence was closely balanced.

¶ 73    "Whether the evidence is closely balanced is, of course, a separate question from whether the evidence is sufficient to sustain a conviction on review against a reasonable doubt challenge." *People v. Piatkowski*, 225 Ill. 2d 551, 566 (2007). While a defendant has no burden to

present any evidence or testimony at trial, defendant has the burden before this court to show that the evidence was closely balanced. *Piatkowski*, 225 Ill. 2d at 567.

¶ 74 "Where the defendant claims first-prong plain error, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51. In determining if the evidence is closely balanced, "a reviewing court must undertake a commonsense analysis of all the evidence in context." *Belknap*, 2014 IL 117094, ¶ 50. Such an assessment must be "a qualitative, as opposed to a strictly quantitative," one. *Belknap*, 2014 IL 117094, ¶ 53; see *People v. Mueller*, 2015 IL App (5th) 130013, ¶¶ 34, 41 (finding the evidence was closely balanced, in part, because "the quality of [a witness's] testimony was weak"). As such, evidence may be closely balanced even if the State presented more witnesses than the defendant. See *People v. Naylor*, 229 Ill. 2d 584, 606-08 (2008) (finding the evidence was closely balanced where two officers testified for the State and only the defendant testified for the defense); *Piatkowski*, 225 Ill. 2d at 567-72 (finding that the evidence was closely balanced where two eyewitnesses testified for the State and the defendant did not testify or provide any evidence, other than the testimony of one police detective); *People v. Jackson*, 2017 IL App (1st) 142879, ¶ 59, 77-78 (finding the evidence was closely balanced where four witnesses testified for the State and one testified for the defense); *Mueller*, 2015 IL App (5th) 130013, ¶¶ 5, 14, 16, 27, 41 (finding the evidence was closely balanced where the State presented two witnesses and the defendant presented no witnesses and no evidence).

¶ 75 Where the essential task of the trier of fact is to determine whose version of events to believe, the evidence is closely balanced. *Naylor*, 229 Ill. 2d at 609. This is especially true where no evidence is introduced to contradict or corroborate either version of events, making credibility

"the only basis upon which defendant's innocence or guilt could be decided." *Naylor*, 229 Ill. 2d at 608. In *Naylor*, our supreme court stated that "[o]f course this evidence was closely balanced" where it "boiled down to the testimony of the two police officers against that of the defendant." *Naylor*, 229 Ill. 2d at 608. In determining whether the evidence was closely balanced, a reviewing court must consider the charge against the defendant and the evidence regarding the elements that are in dispute. See *Sebby*, 2017 IL 119445, ¶ 54.

¶ 76        Here, defendant was charged with aggravated assault of a teacher or school employee. As explained above, defendant did not dispute that she knew Ms. Rosie was a school employee and was on school grounds at the time of the incident. The only disputed issue was whether Ms. Rosie was in reasonable apprehension of receiving a battery from defendant. Here, the evidence was closely balanced as to whether defendant engaged in conduct that placed Ms. Rosie in reasonable apprehension of receiving a battery. While the witnesses' testimony established that defendant yelled at Ms. Rosie, likely used inappropriate language, and may have even threatened her, that conduct was not enough to objectively place Ms. Rosie in reasonable apprehension of receiving a battery. See *Floyd*, 278 Ill. App. 3d at 570 (words alone are not enough to establish an assault). Some physical actions or conduct, such as movements or gestures, must have accompanied defendant's words. See *Floyd*, 278 Ill. App. 3d at 571; *Vanhoose*, 2020 IL App (5th) 170247, ¶ 32.

¶ 77        In this case, defendant's physical conduct consisted of (1) walking along the side of Ms. Rosie's desk and (2) pushing down one or more plexiglass panels attached to Ms. Rosie's desk. However, the testimony on these issues was conflicting. Both defendant and D.R. testified that defendant moved only slightly to her left while she was arguing with Ms. Rosie, not halfway around the desk, as Ms. Rosie, Buggs, and Knuckey testified. Furthermore, even if defendant did

walk several feet around the side of Ms. Rosie's desk and toward the back opening of her desk, the evidence established that defendant was still at least five feet away from Ms. Rosie when she was intercepted by Buggs. Additionally, Ms. Rosie testified that "both Mr. Knuckey and Mr. Buggs were there the entire time." Because of defendant's distance from Ms. Rosie, as well as the proximity of Buggs and Knuckey, a different jury could have determined that it was not objectively reasonable for Ms. Rosie to believe that defendant would ever get close enough to batter her before Buggs or Knuckey intervened. Based on all these circumstances, the evidence was closely balanced as to whether defendant's conduct of moving around the side of Ms. Rosie's desk placed Ms. Rosie in reasonable apprehension of being battered by defendant.

¶ 78    Furthermore, the testimony was conflicting about whether defendant knocked down any plexiglass panels, with Ms. Rosie testifying that defendant knocked down one panel, Buggs testifying that defendant knocked down two panels, and Knuckey, defendant, and D.R. all testifying that defendant did not knock down any panels. Additionally, although Ms. Rosie testified that she was putting the panel back up as Manecke entered the office, Manecke denied this, testifying that he observed all the panels in place when he came into the main office. Additionally, both Buggs and Ms. Rosie admitted that they never told Manecke about defendant knocking down any plexiglass, even though Buggs agreed that was relevant information. Whether defendant knocked down the plexiglass panels was important because it was the only conduct, other than her movement toward Ms. Rosie, that could support her assault conviction. See *Floyd*, 278 Ill. App. 3d at 570 (words alone are not enough to establish an assault). The evidence was far from overwhelming on this issue.

¶ 79    At trial, there was no video recording of the incident or any physical evidence to support or refute any of the testimony provided by the witnesses at trial. Instead, the jury had to

assess the credibility of the witnesses and decide who to believe. As explained above, the witnesses' testimony about defendant's physical movements, which was necessary to support her assault conviction, was inconsistent. Thus, the evidence was closely balanced. See *Naylor*, 229 Ill. 2d at 608.

¶ 80         Under the circumstances of this case, defendant met his burden of proving that the evidence was so closely balanced that the erroneous admission of Manecke's testimony threatened to tip the scales of justice. First, Manecke's improper testimony about Knuckey's and Buggs's statements revealed that both Knuckey and Buggs believed that defendant intended to "get to" Ms. Rosie, thereby supporting the State's theory that Ms. Rosie reasonably feared that she would receive a battery from defendant. Additionally, Manecke's testimony about his determination that an assault was committed by defendant was even more prejudicial because it amounted to an opinion by a "figure of authority" on the ultimate disputed fact in the case—that defendant committed assault. See *Crump*, 319 Ill. App. 3d at 543, 544. Thus, we hold that Manecke's testimony amounted to plain error and reverse and remand for a new trial.

¶ 81                          5. *Ineffective Assistance*

¶ 82         Since we find that plain error occurred, we need not consider whether counsel provided defendant ineffective assistance. See *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 59.

¶ 83                          C. Double Jeopardy

¶ 84         Although we conclude that the evidence was closely balanced, we nevertheless find, as explained above, that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt. We therefore find that there is no double jeopardy impediment to a new trial. See *Naylor*, 229 Ill. 2d at 611. By this finding, however, we reach no conclusion as to defendant's guilt that would be binding on retrial. *Naylor*, 229 Ill. 2d at 611.

¶ 85                              D. Defendant's Remaining Issues

¶ 86        Defendant raises two additional claims of error on appeal; however, because we have determined that we must reverse defendant's conviction and remand for a new trial, we need not consider these alleged errors, as we have no reason to believe they are likely to recur on remand. See *Mueller*, 2015 IL App (5th) 130013, ¶ 43.

¶ 87                                    III. CONCLUSION

¶ 88        For the reasons stated, we reverse the trial court's judgment and remand for a new trial.

¶ 89        Reversed and remanded.